MICHAEL B. HORROW (SBN 162917)
SCOTT E. CALVERT (SBN 210787)
DONAHUE & HORROW, LLP
1960 E. Grand Avenue, Suite 1215
El Segundo, California 90245
Telephone: (310) 322-0300
Facsimile: (310) 322-0302
Email: mhorrow@donahuehorrow.com
Email: scalvert@donahuehorrow.com

Attorneys for Plaintiff Christopher Cude

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| CHRISTOPHER CUDE,<br><br>           Plaintiff,<br><br>     vs.<br><br>THE LINCOLN NATIONAL LIFE INSURANCE COMPANY; WELLS FARGO & COMPANY LONG-TERM DISABILITY PLAN; DOES 1 THROUGH 10<br><br>           Defendants. | Case No.: 8:25-cv-00123 AH(KESx)<br><br>**COMPLAINT FOR LONG-TERM DISBABILTY BENEFITS UNDER A GROUP EMPLOYEE BENEFIT PLAN** |

Plaintiff alleges as follows:

1. This Court's jurisdiction is invoked pursuant to 28 U.S.C. §§1331, 1337 and 29 U.S.C. §1132(a), (e), (f) and (g), of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001, *et seq.* ("ERISA") as it involves a claim by Plaintiff for long-term disability ("LTD") benefits under an employee benefit plan regulated and governed under ERISA.  Jurisdiction is predicated under these code sections as well as 28 U.S.C. §1331, as this action involves a federal question.

2. The events or omissions giving rise to Plaintiff's claim occurred in this judicial district, thus venue is proper here pursuant to 28 U.S.C. §1391(b)(2), and the ends of justice so require.

3. The ERISA statute at 29 U.S.C. §1133, in accordance with Regulations of the Secretary of Labor, provides a mechanism for internal appeal of benefit denials.  Those avenues of appeal have been exhausted.

4. Plaintiff CHRISTOPHER CUDE ("Plaintiff" or "Mr. Cude") is a resident of Orange County and citizen of the State of California, and at all relevant times was an employee of Wells Fargo & Company ("Wells Fargo") and a participant in its employee benefit plan, identified below.

5. Plaintiff alleges upon information and belief that Defendant THE LINCOLN NATIONAL LIFE INSURANCE COMPANY ("Lincoln") is, and at all relevant times was, a corporation duly organized and existing under and by virtue of the laws of the State of Indiana and authorized to transact and transacting the business of insurance in this state.

6. Plaintiff is informed and believes and thereon alleges that Defendant WELLS FARGO & COMPANY LONG-TERM DISABILITY PLAN ("Plan") is an employee welfare benefit plan established and maintained by Wells Fargo (and/or its related corporate entities) to provide its employees with monthly LTD income insurance protection, and, is the Plan Administrator.

7. The true names or capacities, whether individual, corporate, associate, or otherwise, of Defendants DOES 1 through 10, are unknown to Plaintiff who therefore sues said Defendants by such fictitious names. Plaintiff is informed and believes and, on such information, and belief alleges that each of the Defendants sued herein as a DOE is legally responsible in some manner for the events and happenings referred to herein, and will ask leave of this court to amend this complaint to insert their true names and capacities in place and instead of the fictitious names when the same become known to Plaintiff.

8. Plaintiff was covered by the Plan. Plaintiff is informed and believes and thereon alleges that Lincoln issued Group Policy Number GF3-850-289424-01 to Wells Fargo and the eligible participants and beneficiaries of the Plan, including Mr. Cude, promising both short-term disability ("STD") benefits and LTD benefits should certain conditions be met.

9. The Plan defines Long Term Disability as in pertinent part, as follows:
"Disability" or "Disabled" means:
- that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and
- thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation."

10. The Plan defines "Any Occupation" as "any occupation that the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity."

11. "Material and Substantial Duties" is defined as "responsibilities that are normally required to perform the Covered Person's Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified."

12. The Plan defines "Active Employment" as follows:

"Active Employment" means the Employee must be actively at work for the Sponsor:

    1. on a fall-time or part-time basis and paid regular earnings;

    2. for at least the minimum number of hours shown in the Schedule of Benefits; and either perform such work:

        a. at the Sponsor's usual place of business; or

        b. at a location to which the Sponsor's business requires the Employee to travel.

An Employee will be considered actively at work if he was actually at work on the day immediately preceding:

    1. a weekend (except where one or both of these days are scheduled work days);

    2. holidays (except when the holiday is a scheduled work day);

    3. paid vacations;

    4. any non-scheduled work day;

    5. an excused leave of absence.

13. The Plan defines "Leave of Absence," as follows:

The Sponsor may continue the Covered Person's coverage(s) by paying the required premiums if the Covered Person is given a leave of absence. The Covered Person's coverage will not continue beyond 24 months for a Worker's Compensation or Medical leave of absence, and coverage will not continue beyond the date leave begins for all other types of leaves. In continuing such coverage under this provision, the Sponsor agrees to treat all Covered Persons equally.

14. The Plan includes a 26-week Elimination Period for LTD benefits following the initial date of disability.

15. Given his age on the date Mr. Cude became disabled, the Plan promises to pay benefits until his Social Security Normal Retirement Age (*i.e.*, 67) should he remain "disabled," as defined by the Plan.

16. Mr. Cude began working at Wells Fargo on or about March 17, 1992. At the time of his disability, Mr. Cude was working for Wells Fargo as a "Private Mortgage Branch Manager."

17. In Summer 2023, as the result of the restrictions and limitations imposed by his comorbid conditions, Mr. Cude became unable to continue working as a Private Mortgage Branch Manager for Wells Fargo. The last day he was able to perform the duties of his occupation was on or about June 28, 2023.

18. In light of his diagnoses and related symptoms, restrictions and limitations, Mr. Cude's treating physicians agreed that he was unable to perform the duties required of a Private Mortgage Branch Manager due to a variety of comorbid conditions, including, but not limited to anxiety, major depression, acute stress, insomnia, lumbar radiculopathy, high cholesterol, heart disease and an enlarged prostate. Mr. Cude's treating physicians and other medical professionals informed Lincoln of these opinions, and his overall condition, through claim forms and medical records.

19. Based upon information and belief, Mr. Cude timely filed a claim for STD benefits under the Plan. Mr. Cude's claim for STD benefits was denied, and that decision was upheld on appeal. Mr. Cude filed a lawsuit, seeking the payment of those STD benefits, which is still pending in this Court at *Christopher Cude v. The Lincoln National Life Insurance Company, et al.,* 8:25-cv-00123-AH-KES.

20. On or about March 21, 2024, Mr. Cude submitted his claim for LTD benefits, which included a job description and updated medical records detailing his ongoing disabling symptoms precluding his return to work.

21. When Mr. Cude made his claim for LTD benefits, Defendants were in possession of the medical records from his STD claim supporting his disability.

COMPLAINT FOR LONG-TERM DISBABILTY BENEFITS UNDER A GROUP EMPLOYEE BENEFIT PLAN

22. For example, in an Attending Physician Statement dated August 29, 2023, Shawn Plowman, PA confirmed that Mr. Cude was unable to work after March 21, 2023 due to Acute Stress Disorder (F43.0). PA Plowman confirmed Mr. Cude's symptoms included, "anxiety, insomnia, [and] trembling." He also advised Lincoln that Mr. Cude's treatment included "medications" and being "off work."

23. Similarly, medical records and treatment notes from Michael Wainwright, M.D., further confirmed that Mr. Cude was no longer able to perform the "essential functions" of his occupation due to his medical conditions. For example, following an August 1, 2023 examination, Dr. Wainwright offered the following assessment/plan: (1) Pain of lower extremity, unspecified laterality (M79.606), Symptomatic. Prescribed ibuprofen 800 mg TID. Resume Lipitor. Patient was given Trazodone for insomnia. Follow up because no complete resolution; (2) Insomnia, unspecified type (G47.00), Symptomatic. Patient given Trazodone for insomnia; (3) Other specified postprocedural states (Z98.890), chronic, controlled; and (4) Mixed hyperlipidemia (E78.2), chronic, controlled.

24. Mr. Cude provided copies of other medical records, including, but not limited to physical therapy records, records from psychiatrist Sharon Chen D.O. (confirming his diagnosis of generalized anxiety disorder and severe episodic major depressive disorder) and the report from his October 2023 lumbar x-ray, which revealed moderate to severe facet arthritis of the lower lumbar spine levels, 4 mm retrolisthesis (slipping of the vertebrae backward onto one another) of L3 on L4 and enlarged L5 with pseudo-fusing with the left sacrum, resulting in pain and reduced mobility.

25. On April 8, 2024, Lincoln acknowledged receipt of Mr. Cude's claim for LTD benefits. Despite its obligation to give Mr. Cude's claim for benefits a full and fair review, Lincoln quickly decided that it was not going approve his claim. Thus, by letter dated April 18, 2024, Lincoln informed Mr. Cude that "[b]ased on the information received, your claim has been denied and no benefits are payable."

26. Mr. Cude timely appealed Lincoln's denial decision. On October 14, 2024, Mr. Cude, through counsel, wrote a detailed appeal letter with exhibits, summarizing his recent, relevant medical records and detailing the ways in which Lincoln's claim decision was incorrect. The letter was accompanied by copies of the updated medical records from PA Plowman, Dr. Wainwright, Dr. Chen and Adam Borecky M.D., as well as physical therapy records.

27. These records further confirmed that Mr. Cude was, and remained, disabled and unable to continue working in his usual, or any, occupation. For example, the records of PA Plowman, Dr. Wainwright and Dr. Chen were consistent with the records submitted in support of the STD claim, detailing both that Mr. Cude's anxiety, insomnia and depression prevent a return to work, and that his arthritis-related pain also kept him from working on a full time basis.

28. Similarly, Dr. Borecky confirmed Mr. Cude's diagnosis of major depressive disorder and worked with him on managing that condition through medication and therapy. Unfortunately, however, the records reveal that Mr. Cude's depression-related symptoms prevented him from performing many day-to-day tasks, and that he lacked the ability to return to fulltime employment.

29. In addition to the updated medical records, Mr. Cude's appeal letter included the results of a Cognitive Functional Capacity Assessment performed by Bahareh Talei, PsyD on June 7, 2024.

30. As part of the assessment, in addition to interviewing Mr. Cude, Dr. Talei administered the following objective tests: Reynolds Intellectual Assessment Scales – Second Edition (RIAS-2), Structured Inventory of Malingered Symptomatology (SIMS) and Wisconsin Card Sorting Test – 64 Card Version (WCST-64). Dr. Talei noted that, overall, Mr. Cude "scored in the profound impairment range."

31. Following the assessment of Mr. Cude and a thorough review of his medical records, Dr. Talei offered the following conclusion:

> This evaluation indicates that Mr. Cude suffers from profound cognitive impairments due to the combined effects of several severe mental health conditions, including depression, high stress, and anxiety. These disorders significantly impair his mental and physical capabilities, resulting in chronic pain and fatigue, which further hinder his professional performance.

32. The letter also included a vocational report, a statement from Mr. Cude explaining how his medical problems prevent him from returning to work and a letter of support from his wife, offering her firsthand account of Mr. Cude's difficulties and how it has impacted their day-to-day life.

33. While Lincoln had the right to ask Mr. Cude to appear for an examination, it failed to do so. Instead, it provided his records to "paper review" physicians who never spoke with or examined Mr. Cude, yet felt qualified to offer opinions regarding his physical and mental capabilities.

34. Lincoln provided copies of the "paper review" reports to Mr. Cude. Over a series of letters, PA Plowman and Dr. Talei explained why the conclusions reached by the non-treating and non-examining physicians were incorrect.

35. Finally, by letter dated April 20, 2025, Lincoln informed Mr. Cude that it reviewed his appeal request, but "maintained the decision to deny benefits."

36. In the letter, Lincoln stated the reasons it believed that, medically, Mr. Cude did not qualify and was not entitled to LTD benefits.

37. Additionally, Lincoln, for the very first time, also based its denial decision on the grounds that, regardless of his medical condition, Mr. Cude was not eligible for any benefits given his employment status on June 28, 2023, his date of disability. Specifically, Lincoln stated that because Mr. Cude was on an "unexcused absence" on that date, he was not in "active employment" as required by the Plan.

38. On May 1, 2025, Mr. Cude sent Lincoln a letter, noting that, the April 20, 2025 letter was the first time that the company offered the rationale that Mr. Cude was not eligible for benefits given his employment status on his date of disability,

and that, under ERISA, it is improper to reach a denial decision but not give the claimant the opportunity to respond.

39. In a letter dated May 13, 2025, Lincoln acknowledged that its April 20, 2025 letter was the first time the company asserted that Mr. Cude was not eligible for benefits based on his employment status on his date of disability, and stated that it would accept a further appeal based on that issue.

40. On September 9, 2025, Mr. Cude sent Lincoln a letter explaining that Lincoln's conclusion that he was not eligible for benefits because he was on a leave of absence on his date of disability was contrary to the facts and the plain language of the Plan, and was therefore incorrect.

41. Mr. Cude explained that under the terms of the Plan, he *was* in "Active Employment" on the date he became disabled. He noted that while Lincoln seems to distinguish between "paid" and "unpaid" leaves of absence in the April 10, 2025 letter, whether Mr. Cude was receiving money from Wells Fargo during his leave of absence is irrelevant to the issue of whether he was in "active employment" at the time he became disabled. Under the terms of the Plan, a claimant on "an excused leave of absence" is considered in "active employment." Mr. Cude noted that while his leave of absence on June 28, 2023 was "unpaid," there is no indication that it was an "unexcused" leave of absence.

42. Accordingly, under the terms of the Plan, Mr. Cude was in "active employment" on June 28, 2023. Additionally, he noted that the Plan's "Leave of Absence" provision further confirmed Mr. Cude's LTD Coverage. Specifically, the Plan states that Wells Fargo "may continue the Covered Person's coverage(s) by paying the required premiums if the Covered Person is given a leave of absence." Mr. Cude provided Lincoln with evidence, through paystubs, that Wells Fargo made the decision to pay the premiums for his coverage through July 1, 2023. Additionally, Mr. Cude himself paid for "Optional LTD" coverage for the same time period.

43. Based on this and other evidence, as well as the rule of *contra proferentem*, which requires that the ambiguity in the Plan be construed in favor of the insured, Mr. Cude established that he was eligible to receive benefits under the terms of the Plan because Lincoln failed to meet its burden of establishing otherwise.

44. By letter dated October 24, 2025, Lincoln informed Mr. Cude that it was upholding its decision that Mr. Cude was not eligible for benefits under the terms of the Plan.

45. Plaintiff has exhausted all required administrative remedies related to his LTD claim, and is allowed to bring a lawsuit against Defendants, pursuant to ERISA, in order to recover all benefits to which he is entitled.

46. As a further direct and proximate result of the denial of benefits, Plaintiff has been required to incur attorneys' fees to pursue this action and is entitled to have such fees paid by Defendants pursuant to 29 U.S.C. §1132(g) (1), ERISA §502(g) (1).

47. A controversy now exists between the parties as to whether Plaintiff is disabled as defined in the Plan and entitled to LTD benefits. Plaintiff seeks the declaration of this Court that he meets the Plan's definition of disability and thus he is entitled to past due disability benefits under the Plan.

WHEREFORE, Plaintiff prays for relief against Defendants as follows:

1. An award of disability benefits from on or about December 21, 2023 to the present;

2. For reasonable attorneys' and costs fees incurred in this action; and,

3. For such other and further relief as the Court deems just and proper.

DATED: November 3, 2025

DONAHUE & HORROW, LLP

_____
MICHAEL B. HORROW
SCOTT E. CALVERT
*Attorneys for Plaintiff Christopher Cude*